UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION

JOSEPH B. GLICK, individually,
and as representative of a Class of
Participants and Beneficiaries
of the ThedaCare Retirement and
403(b) Savings Plan,

        Plaintiff,                          Case No. 20-cv-1236

        v.                               **CLASS ACTION COMPLAINT**
                                          **FOR CLAIMS UNDER**
THEDACARE, INC.,                       **29 U.S.C. § 1132(a)(2)**

        and

THE BOARD OF DIRECTORS OF
THEDACARE, INC.,

        and

JOHN DOES 1-30,

        Defendants

---

## COMPLAINT

COMES NOW Plaintiff, Joseph B. Glick, individually and as representative of a Class of

Participants and Beneficiaries on behalf of the ThedaCare, Inc. Retirement and 403(b) Savings

Plan (the "Plan"), by his counsel, WALCHESKE & LUZI, LLC, as and for a claim against

Defendants, alleges and asserts to the best of his knowledge, information and belief, formed after

an inquiry reasonable under the circumstances, the following:

## INTRODUCTION

1.      The essential remedial purpose of the Employee Retirement Income Security Act ("ERISA") is "to protect the beneficiaries of private pension plans." *Nachwalter v. Christie*, 805 F.2d 956, 962 (11th Cir. 1986).[1]

2.      The law is settled that ERISA fiduciaries have a duty to evaluate fees and expenses when selecting recordkeepers, investments, and service providers, *as well as* a continuing duty to monitor fees and expenses of selected recordkeepers, investments, and service providers, and remove imprudent ones. *Tibble v. Edison Int'l,* 135 S. Ct. 1823, 1828 (2015); 29 U.S.C. §1104(a)(1)(A) (fiduciary duty includes "defraying reasonable expenses of administering the plan"); 29 C.F.R. § 2250.404a-1(b)(i) (ERISA fiduciary must give "appropriate consideration to those facts and circumstances" that "are relevant to the particular investment.") It is for good reason that ERISA requires fiduciaries to be cost-conscious:

> Expenses, such as management or administrative fees, can sometimes significantly reduce the value of an account in a defined-contribution plan, *Tibble,* 135 S. Ct. at 1826, by decreasing its immediate value, and by depriving the participant of the prospective value of funds that would have continued to grow if not taken out in fees.

*Sweda v. Univ. of Pa.*, 923 F.3d 320, 328 (3d Cir. 2019).

3.      Defendants ThedaCare, Inc. ("ThedaCare"), the Board of Directors of ThedaCare, Inc. ("Board Defendants"), and John Does 1-30 (collectively, "Defendants"), are ERISA fiduciaries as they exercise discretionary authority or discretionary control over the 403(b) defined contribution pension plan – known as the ThedaCare, Inc. Retirement and 403(b) Savings Plan ("The Plan") – that it sponsors and provides to its employees**.**

---

[1]     Unless indicated otherwise, cited and quoted cases are omitted.

4.     Plaintiff alleges that during the putative Class Period (August 12, 2014 through the date of judgment), Defendants, as fiduciaries of the Plan, as that term is defined under ERISA, 29 U.S.C. § 1002(21)(A), breached the duties they owed to the Plan, to Plaintiff, and to the other participants of the Plan by, among other things: (1) authorizing the Plan to pay unreasonably high fees for recordkeeping and administration (RK&A); (2) failing to objectively, reasonably, and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (3) unreasonably maintaining investment advisors and consultants for the Plan despite the known availability of similar service providers with lower costs and/or better performance histories.

5.     These unreasonable RK&A fees, investment selections, and service provider selections cannot be justified.  Defendants' failure to monitor and improve the recordkeeper, investment options, and investment advisors and consultants confirms more than simply sloppy business practice. Defendants' failures breached the fiduciary duties they owed to Plaintiff, Plan Participants, and beneficiaries. Prudent fiduciaries of 403(b) plans continuously monitor fees against applicable benchmarks and peer groups to identify unreasonable and unjustifiable fees. Defendants did not engage in a prudent decision-making process and/or engaged in self-dealing, as there is no other explanation for why the Plan paid these unreasonable fees for RK&A, investment management, and investment advisory and consultant services.

6.     To remedy, Plaintiff brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from their breaches of fiduciary duty.

## JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction in this ERISA matter under 28 U.S.C. § 1331 and pursuant to 29 U.S.C. § 1332(e)(1), which provides for federal jurisdiction of actions brought under Title I of ERISA, 29 U.S.C. § 1001 et seq.

8.      This Court has personal jurisdiction over Defendants because they transact business in this District, reside in this District, and have significant contacts with this District, and because ERISA provides for nationwide service of process.

9.      Venue is appropriate in this District within the meaning of 29 U.S.C. § 1132(e)(2) because some or all of the violations of ERISA occurred in this District and Defendants reside and may be found in this District. Venue is also proper in this District pursuant to 28 U.S.C. § 1391 because Defendants do business in this District and a substantial part of the events or omissions giving rise to the claims asserted herein occurred within the District.

10.     In conformity with 29 U.S.C. §1132(h), Plaintiff served the original Complaint by certified mail on the Secretary of Labor and the Secretary of the Treasury.

## PARTIES

11.     Plaintiff, Joseph B. Glick, is a resident of the State of Wisconsin and currently resides in Neenah, Wisconsin, and during the Class Period, was a participant in the Plan under 29 U.S.C. § 1002(7).

12.     Plaintiff has standing to bring this action on behalf of the Plan because he participated in the Plan and was injured by Defendants' unlawful conduct.

13.     The named Plaintiff and all Participants in the Plan suffered ongoing financial harm as a result of Defendant's continued imprudent and unreasonable investment and fee decisions made with regard to the Plan.

14. The named Plaintiff and all participants in the Plan did not have knowledge of all material facts (including, among other things, the RK&A fees, investment alternatives that are comparable to the investments offered within the Plan, comparisons of the costs and investment performance of Plan investments versus available alternatives within similarly-sized plans, total cost comparisons to similarly-sized plans, information regarding other available share classes, and information regarding the availability and pricing of other service providers) necessary to understand that Defendants breached their fiduciary duties and engaged in other unlawful conduct in violation of ERISA until shortly before this suit was filed.

15. The named Plaintiff and all participants in the Plan, having never managed a large 403(b) plan such as the Plan, lacked actual knowledge of reasonable fee levels and prudent alternatives available to such plans.

16. ThedaCare, Inc. ("ThedaCare") is a company with its principal headquarters located at 122 East Collins Avenue, Appleton, Wisconsin 54912. In this Complaint, "ThedaCare" refers to the named defendant and all parent, subsidiary, related, predecessor, and successor entities to which these allegations pertain. ThedaCare is a community health system consisting of seven hospitals, numerous clinics, and related services. It is the third largest health care employer in Wisconsin and the largest employer in Wisconsin's second largest economic market – Northeast Wisconsin – with approximately 6,800 employees.

17. ThedaCare is both the Plan sponsor and the Plan Administrator of the ThedaCare Retirement and 403(b) Savings Plan.

18. As the Plan Administrator, ThedaCare is a fiduciary with day-to-day administration and operation of the Plan under 29 U.S.C. § 1002(21)(A). It has authority and responsibility for the control, management, and administration of the Plan in accordance with 29 U.S.C. § 1102(a).

ThedaCare has exclusive responsibility and complete discretionary authority to control the operation, management, and administration of the Plan, with all powers necessary to properly carry out such responsibilities.

19. ThedaCare acted through its officers, including the Board Defendants, and their members, John Does 1-10, to perform Plan-related fiduciary functions in the course and scope of their business. For these reasons, ThedaCare is a fiduciary of the Plan, within the meaning of 29 U.S.C. § 1002(21)(A).

20. ThedaCare in its Plan Administrator capacity, as well as individuals who carried out Plan functions (John Does 11-20), are collectively referred to herein as the "Plan Administrator Defendants."

21. To the extent that there are additional officers and employees of ThedaCare who are/were fiduciaries of the Plan during the Class Period, or other individuals who were hired as investment managers for the Plan during the Class Period, the identities of whom are currently unknown to Plaintiff, Plaintiff reserves the right, once their identities are ascertained, to seek leave to join them to the instant action. Thus, without limitation, unknown "John Doe" Defendants 21-30 include, but are not limited to, ThedaCare officers and employees who are/were fiduciaries of the Plan within the meaning of ERISA Section 3(21)(A), 29 U.S.C. § 1002(21)(A), during the Class Period.

22. The Plan is a "defined contribution" pension plan under 29 U.S.C. § 1102(2)(A) and 1002(34), meaning that ThedaCare's contribution to the payment of Plan costs is guaranteed but the pension benefits are not. In a defined contribution plan, the value of participants' investments is "determined by the market performance of employee and employer contributions, less expenses." *Tibble*, 135 S. Ct.at 1826. Thus, the employer has no incentive to keep costs low

or to closely monitor the Plan to ensure every investment remains prudent, because all risks related to high fees and poorly-performing investments are borne by the participants.

23.     Currently, the Plan has about $540,000,000 in assets entrusted to the care of the Plan's fiduciaries. The Plan had substantial bargaining power regarding the fees and expenses that were charged against participants' investments. Defendants, however, did not try to reduce the Plan's expenses or exercise appropriate judgment to monitor each investment option to ensure it was a prudent choice.

24.     With 8,106 participants in the year 2018, the Plan had more participants than 99% of defined contribution plans in the United States who filed 5500 forms for the 2018 plan year. Similarly, with $538,687,695 assets in the year 2018, the Plan had more assets than 99% of defined contribution plans in the United States who filed 5500 forms for the 2018 plan year.

## ERISA'S FIDUCIARY STANDARDS

25.     ERISA imposes strict fiduciary standards of loyalty and prudence on Defendants as Plan Fiduciaries. 29 U.S.C. § 1104(a)(1) provides in relevant part:

> [A] fiduciary shall discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries and –
>
> > (A) for the exclusive purpose of:
> >
> > > (i) providing benefits to participants and their beneficiaries; and
> > > (ii) defraying reasonable expenses of administering the plan; [and]
> >
> > (B) with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

26.     With certain exceptions, 29 U.S.C. § 1103(c)(1) provides in relevant part:

[T]he assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan.

27.     29 U.S.C. § 1109 provides in relevant part:

Any person who is a fiduciary with respect to a plan who breaches any of the responsibilities, obligations, or duties imposed upon fiduciaries by this subchapter shall be personally liable to make good to such plan any losses to the plan resulting from each such breach, and to restore to such plan any profits of such fiduciary which have been made through use of assets of the plan by the fiduciary, and shall be subject to such other equitable or remedial relief as the court may deem appropriate, including removal of such fiduciary.

28.     Under ERISA, fiduciaries that exercise any authority or control over plan assets, including the selection of plan investments and service providers, must act prudently and for the exclusive benefit of participants in the plan, and not for the benefit of third parties including service providers to the plan such as recordkeepers and those who provide investment products. Fiduciaries must ensure that the amount of fees paid to those service providers is no more than reasonable. DOL Adv. Op. 97-15A; DOL Adv. Op. 97-16A; *see also* 29 U.S.C. §1103(c)(1) (plan assets "shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan").

29.     "[T]he duty to conduct an independent investigation into the merits of a particular investment" is "the most basic of ERISA's investment fiduciary duties." *In re Unisys Savings Plan Litig.,* 74 F.3d 420, 435 (3d Cir. 1996); *Katsaros v. Cody*, 744 F.2d 270, 279 (2nd Cir. 1984) (fiduciaries must use "the appropriate methods to investigate the merits" of plan investments). Fiduciaries must "initially determine, and continue to monitor, the prudence of each investment option available to Plan Participants." *DiFelice v. U.S. Airways, Inc*., 497 F.3d 410, 423 (4th Cir. 2007); (emphasis original); 29 C.F.R. § 2550.404a-1; DOL Adv. Opinion 98-04A; DOL Adv.

Opinion 88-16A. Thus, a defined contribution Plan Fiduciary cannot "insulate itself from liability by the simple expedient of including a very large number of investment alternatives in its portfolio and then shifting to the participants the responsibility for choosing among them." *Hecker v. Deere & Co.*, 569 F.3d 708, 711 (7th Cir. 2009). Fiduciaries have "a continuing duty to monitor investments and remove imprudent ones[.]" *Tibble,* 135 S. Ct. at 1828-29.

30.     "Wasting beneficiaries' money is imprudent. In devising and implementing strategies for the investment and management of trust assets, trustees are obligated to minimize costs." Uniform Prudent Investor Act § 7.

31.     29 U.S.C. § 1132(a)(2) authorizes Plan Participants to bring a civil action for appropriate relief under 29 U.S.C. § 1109.

## DEFINED CONTRIBUTION INDUSTRY

32.     Over the past three decades, defined contribution plans have become the most common employer-sponsored retirement plan. A defined contribution plan allows employees to make pre-tax elective deferrals through payroll deductions to an individual account under the plan. Among many options, employers may make contributions on behalf of all employees and/or make matching contributions based on the employees' elective deferrals.  Employees with money in the plan are referred to as participants.

**Recordkeeping and Related Administrative Services**

33.     Recordkeeping and related administrative ("RK&A") services are necessary for all defined contribution plans. These services include, but are not limited to, those related to maintaining plan records, tracking participant account balances and investment elections, transaction processing, call center support, participant communications, and trust and custody services.

34.     Third-party service providers, often known as "recordkeepers," provide RK&A services on behalf of a defined contribution plan. Some recordkeepers provide only recordkeeping and related services and some recordkeepers are subsidiaries of financial services and insurance companies that distribute mutual funds, insurance products, and other investment options.

35.     The market for defined contribution recordkeeping services is highly competitive, particularly for a Plain like Defendants' with large numbers of participants and large amounts of assets.

36.     Since at least the mid-2000s, the market rate that Plan Fiduciaries have paid for fees for RK&A services has decreased.

37.     The underlying cost to a recordkeeper of providing the RK&A services to a defined contribution plan is primarily dependent on the number of participant accounts in the plan rather than the amount of assets in the plan.

38.     The incremental cost for a recordkeeper to provide RK&A services for a participant's account does not materially differ from one participant to another and is generally not dependent on the balance of the participant's account.

39.     The Plan is larger than 99% of all ERISA-covered defined contribution plans in the United States as measured by both participants and assets.

40.     Recordkeepers for relatively larger defined contribution plans, like the Plan here, experience certain efficiencies of scale that lead to a reduction in the per-participant cost as the number of participants increase because the marginal cost of adding an additional participant to a recordkeeping platform is relatively low. These economies of scale are inherent in all recordkeeping arrangements for defined contribution plans. When the number of participants with an account balance increases in a defined contribution plan, the recordkeeper is able to spread the

cost of providing recordkeeping services over a larger participant base, thereby reducing the unit cost of delivering services on a per-participant basis.

41.     Therefore, while the total cost to a provider for RK&A services increases as more participants join the plan, the cost per participant to deliver the services decreases.

42.     Since at least the early 2000s, Plan Fiduciaries and their consultants and advisors have been aware of this cost structure dynamic for RK&A providers.

43.     Since at least the early 2000s, Defendants were aware of this cost structure dynamic for RK&A providers.

44.     Sponsors of defined contribution plans contract for RK&A services separately from any contracts related to the provision of investment management services to Plan Participants.

45.     The investment options selected by Plan Fiduciaries often have a portion of the total expense ratio allocated to the provision of recordkeeping services that the recordkeeper provides on behalf of the investment manager, e.g., RK&A services.

46.     As a result, RK&A service providers often make separate contractual arrangements with mutual fund providers. RK&A providers then collect a portion of the investment management fees in return for providing services that would otherwise have to be provided by the mutual fund.

47.     The fees described in the aforementioned paragraph are known in the defined contribution industry as "revenue sharing."

48.     For example, if a mutual fund has a total expense ratio of 0.75%, the mutual fund provider may agree to pay the RK&A provider 0.25% of the 0.75% fee that is paid by the investor in that mutual fund (in this context the Plan Participant). That 0.25% portion of the 0.75% fee is known as the "revenue sharing."

49.     In the context of defined contribution plans, the amount of revenue sharing is

deemed to be the amount of revenue paid by participants that is allocable to RK&A services and, in some cases, other services provided to the plan. The difference between the total expense ratio and the revenue sharing is known as the "net investment management fee" or the "net investment expense."

50.     In the context of defined contribution plans, when a plan adopts prudent and best practices, the net investment expense is the actual amount a Plan Participant pays for the investment management services provided by a portfolio manager.

51.     Providers of Retirement Plan Services, including RK&A services, typically collect their fees through direct payments from the plan or through indirect compensation such as revenue sharing, or some combination of both.

52.     Regardless of the pricing structure that the Plan Fiduciary negotiates with the recordkeeper, the amount of compensation paid to the recordkeeper for the RK&A services must be reasonable.

53.     As a result, Plan Fiduciaries must understand the total dollar amounts paid to their RK&A provider and be able to determine whether the compensation is reasonable by understanding what the market is for the RK&A services received by the Plan.

54.     Because RK&A fees are actually paid in dollars and because of the cost dynamic noted in the aforementioned paragraphs, the fees paid for RK&A services are evaluated and compared on a dollar per participant basis.

55.     It is well known among retirement plan consultants and advisors (who often act as co-fiduciaries to the Plan Fiduciaries) that, all else being equal, a plan with more participants can and will receive a lower effective per participant fees when evaluated on a per participant basis.

56.     During the Class Period, Defendants knew and/or were aware that a plan with more

participants can and will receive a lower effective per participant fee when evaluated on a per participant basis.

57.     During the Class Period, Defendants knew and/or were aware that the Plan could and would receive a lower effective per participant fee when evaluated on a per participant basis.

58.     Plan Fiduciaries of a defined contribution plan have a continuing and regular responsibility to select and monitor all investment options they make available to Plan Participants.

**Investments**

59.     The primary purpose in selecting plan investments is to give all participants the opportunity to create an appropriate asset allocation under modern portfolio theory by providing diversified investment alternatives.

60.     In selecting different investment options to make available to Plan Participants, the Plan Fiduciaries are held to the prudent investor standard when choosing investment managers or, alternatively, choosing index investment options. When choosing an active investment option, the analysis is focused on determining whether the portfolio manager is likely to outperform an appropriate benchmark.

61.     Accordingly, the primary focus when choosing an active investment option to make available to Plan Participants is the skill of the portfolio manager. In many cases a plan sponsor can receive the investment management services of the same portfolio manager through different share classes. When the same investment management services are provided through a mutual fund with different share classes, the fee paid to the portfolio manager is the same for all share classes. The difference in the share class fees is the amount of additional fees which can be used to pay for, among other things, RK&A services.

62.     A Plan Fiduciary choosing a more expensive way to provide identical services of

the same portfolio manager must have a rational and informed reason. The Plan Fiduciaries must make an explicit finding that the more expensive option is in the best interest of Plan Participants.

## **THE PLAN**

63.     Started on January 1, 2004, the Plan now has around 8,000 participants and assets of approximately $540,000,000. More specifically, at the end of the year 2018, the Plan had approximately 7847 participants and approximately $538,687,695 in assets. During the Class Period (from August 12, 2014 through the date of judgment), Defendants maintained an investment platform that offered about 29 different investment choices to its participants.

64.     At all relevant times, the Plan's fees were excessive when compared with other comparable 401(k) and 403(b) plans offered by other sponsors with similar numbers of Plan Participants during this same time period and with similar amounts of money under management.

65.     At all relevant times, the Plan's excessive fees led to lower net returns than participants enjoyed in comparable 401(k) and 403(b) plans offered by other sponsors with similar numbers of Plan Participants during this same time period and with similar amounts of money under management.

66.     During the Class Period, Defendants breached their duties owed to the Plan, to Plaintiff, and to all other Plan Participants, by: (1) failing to objectively, reasonably, and adequately review the Plan's investment portfolio with due care to ensure that each investment option was prudent, in terms of cost; and (2) unreasonably maintaining certain funds in the Plan despite the availability of identical or similar investment options with lower costs and/or better performance histories. Defendants also failed to use the lowest cost share class or lower cost collective trusts for many of the mutual funds within the Plan.

67.     Defendants' mismanagement of the Plan, to the detriment of Plan Participants and

beneficiaries, breached the fiduciary duties of prudence and loyalty in violation of 29 U.S.C. §

1104.

68.     In addition, ERISA § 405(a), 29 U.S.C. § 1105(a) (entitled "Liability for breach by

co-fiduciary") provides that:

> [I]n addition to any liability which he may have under any
> other provision of this part, a fiduciary with respect to a plan
> shall be liable for a breach of fiduciary responsibility of
> another fiduciary with respect to the same plan in the
> following circumstances: (A) if he participates knowingly
> in, or knowingly undertakes to conceal, an act or omission
> of such other fiduciary, knowing such an act or omission is
> a breach; (B) if, by his failure to comply with section
> 404(a)(1), 29 U.S.C. §1104(a)(1), in the administration of
> his specific responsibilities which give rise to his status as a
> fiduciary, he has enabled such other fiduciary to commit a
> breach; or (C) if he has knowledge of a breach by such other
> fiduciary, unless he makes reasonable efforts under the
> circumstances to remedy the breach.

69.     As discussed below, Defendants breached fiduciary duties to the Plan and its

participants and beneficiaries and are liable for their breaches and the breaches of their co-

fiduciaries under 29 U.S.C. § 1104(a)(1) and 1105(a).

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING RECORDKEEPERS

70.     A Plan Fiduciary is required to fully understand all sources of revenue received by

its RK&A service provider/recordkeeper. It must regularly monitor that revenue to ensure that the

compensation received by the recordkeeper is and remains reasonable for the services provided.

71.     Prudent Plan Fiduciaries ensure they are paying only reasonable fees for RK&A

services by soliciting competitive bids from other service providers to perform the same services

currently being provided to the plan. This is not a difficult process and is performed regularly by

Plan Fiduciaries. Plan Fiduciaries need only request a bid from salespeople at other service

providers. For plans with as many participants as Defendants' Plan, most recordkeepers would require only the number of participants and the amount of the assets to provide a quote while others might only require the number of participants.

72. Prudent Plan Fiduciaries have all of this information readily available and can easily receive a quote from other service providers to determine if the current level of fees is reasonable.

73. Having received bids, the prudent Plan Fiduciary can negotiate with its current provider for a lower fee and/or move to a new provider to provide the same (or better) services for a competitive reasonable fee.

74. Prudent Plan Fiduciaries can follow this same process for retirement plan advisors and/or consultants as well as any other covered service providers.

75. A prudent Plan Fiduciary uses a per-participant revenue requirement pricing structure. Under this structure, the Plan Fiduciary and service provider negotiate a fixed per participant threshold. In other words, the recordkeeper's fee for providing RK&A services is a fixed amount per participant, e.g., $45.00 per participant. For example, according to the DC Callan Trend Surveys, "Explicit per participant dollar fee," the following percentage of plans were charged on a per-participant basis for the following calendar years: (1) for the year 2016: 41.6% of plans were charged on a per-participant basis; (2) for the year 2017: 54.7% of plans were charged on a per-participant basis; (3) for the year 2018: 63.8% of plans were charged on a per-participant basis; and (4) for the year 2019: 64.9% of plans were charged on a per-participant basis.

76. After the revenue requirement is negotiated, the Plan Fiduciary determines how to pay the negotiated RK&A fee. The employer/plan sponsor can pay the recordkeeping fee on behalf

of participants, which is the most beneficial to Plan Participants. If the employer were paying the fee, the employer would have an interest in negotiating the lowest fee a suitable recordkeeper would accept. Usually, however, the employer decides to have the Plan (Plan Participants) pay the recordkeeping fee instead. If the recordkeeping fee is paid by Plan Participants, the Plan Fiduciary can allocate the negotiated recordkeeping fee among participant accounts at the negotiated per-participant rate, or pro-rata based on account values, among other less common ways.

77.     In other words, if the Plan negotiates a per participant revenue threshold, e.g., $45.00, the plan does not need to require that each participant pay $45.00. Rather, the Plan Fiduciary could determine that an asset-based fee is more appropriate for Plan Participants and allocate the RK&A fee pro rata to participants. For example, a 10,000-participant plan with a $45.00 revenue threshold would pay $450,000 for RK&A services. If the plan had $450,000,000 in assets, then the $450,000 would work out to 10 basis points. Accordingly, the Plan Fiduciary could allocate the $450,000 to Plan Participants by requiring that each participant pay 10 basis points.

78.     In an asset-based pricing structure, the amount of compensation received by the service provider is based on a percentage of the total assets in the plan. This structure creates situations in which the services provided by the recordkeeper do not change but, because of market appreciation and contributions to the plan, the revenue received by the recordkeeper increases. This structure was historically preferred by recordkeepers because it allowed recordkeepers to obtain an increase in revenue without having to ask the client to pay a higher fee.

79.     Regardless of the pricing structure negotiated by the Plan Fiduciary, the Plan Fiduciary must ensure that the fee paid to the recordkeeper is reasonable for the level of services provided.

80.     All of these standards were accepted and understood by Plan Fiduciaries, including Defendants, at all times during the Class Period.

81.     For example, fiduciary best practices based on DOL guidelines, case law, and marketplace experience are as follows:

> 1. Price administrative fees on a per-participant basis.
>
> 2. Benchmark and negotiate recordkeeping and investment fees separately.
>
> 3. Benchmark and negotiate investment fees regularly, considering both fund vehicle and asset size.
>
> 4. Benchmark and negotiate recordkeeping and trustee fees at least every other year. . . .
>
> 7. Review services annually to identify opportunities to reduce administrative costs.[2]

82.     Defendants' recordkeeper during the Class Period, Transamerica Retirement Solutions ("Transamerica"), is well known as a high cost recordkeeper and administrator and tends to have platforms that encourage higher fee funds.

83.     Prudent fiduciaries implement three related processes to prudently manage and control a plan's recordkeeping costs. *Tussey v. ABB, Inc.,* 746 F.3d 327, 336 (8th Cir. 2014) (holding that fiduciaries of a 401(k) plan "breach[] their fiduciary duties" when they "fail[] to monitor and control recordkeeping fees" incurred by the plan); *George v. Kraft Foods Glob.*, Inc., 641 F.3d 786, 800 (7th Cir. 2011) (explaining that defined contribution Plan Fiduciaries have a "duty to ensure that [the recordkeeper's] fees [are] reasonable").

84.     First, a Plan Fiduciary must pay close attention to the recordkeeping fees being paid by the plan. A prudent fiduciary tracks the recordkeeper's expenses by demanding documents that

---

[2] "Fiduciary Best Practices," *DC Fee Management — Mitigating Fiduciary Risk and Maximizing Plan Performance*, Mercer Investment Consulting (2013).

summarize and contextualize the recordkeeper's compensation, such as fee transparencies, fee analyses, fee summaries, relationship pricing analyses, cost-competitiveness analyses, and multi-practice and standalone pricing reports.

85.     Second, to make an informed evaluation as to whether a recordkeeper or other service provider is receiving no more than a reasonable fee for the services provided to a plan, a prudent fiduciary must identify all fees, including direct compensation and revenue sharing being paid to the plan's recordkeeper. To the extent that a plan's investments pay asset-based revenue sharing to the recordkeeper, prudent fiduciaries monitor the amount of the payments to ensure that the recordkeeper's total compensation from all sources does not exceed reasonable levels, and require that any revenue sharing payments that exceed a reasonable level be returned to the plan and its participants.

86.     Third, the plan's fiduciaries must remain informed about overall trends in the marketplace regarding the fees being paid by other plans, as well as the recordkeeping rates that are available. This will generally include conducting a Request for Proposal ("RFP") process at reasonable intervals, and immediately if the plan's recordkeeping expenses have grown significantly or appear high in relation to the general marketplace. More specifically, an RFP should happen at least every three (3) to five (5) years as a matter of course, and more frequently if the plans experience an increase in recordkeeping costs or fee benchmarking reveals the recordkeeper's compensation to exceed levels found in other, similar plans.

## THE PLAN'S FIDUCIARIES DID NOT EFFECTIVELY MONITOR RK&A FEES AND, AS A RESULT, THE PLAN PAID UNREASONABLE RK&A FEES

87.     A Plan Fiduciary must continuously monitor its RK&A fees by regularly soliciting competitive bids to ensure fees paid to covered service providers (such as recordkeepers) are reasonable.

88.     During the Class Period, Defendants knew or should have known that they must regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Transamerica.

89.     During the Class Period, Defendants failed to regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Transamerica.

90.     During the Class Period, Defendants knew or should have known that they must regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Transamerica, in order to avoid paying unreasonable fees for RK&A services.

91.     During the Class Period, Defendants failed to regularly solicit quotes and/or competitive bids from covered service providers, including but not limited to Transamerica, in order to avoid paying unreasonable fees for RK&A services.

92.     During the Class Period, Defendants knew or should have known that it was in the best interests of the Plan's Participants to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

93.     During the Class Period, Defendants failed to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

94.     During the Class Period, Defendants did not have a plan or process in place to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

95.     During the Class Period, Defendants did not engage in any objectively reasonable and/or prudent efforts to ensure that the Plan paid no more than a competitive reasonable fee for RK&A services.

96.     During the Class Period and because Defendants failed to regularly monitor the Plan's RK&A fees paid to covered service providers, including but not limited to Transamerica,

these RK&A service fees were significantly higher than they would have been had Defendants engaged in this process.

97.     During the Class Period and because Defendants did not solicit quotes and/or competitive bids from covered service providers, including but not limited to Transamerica, before and/or when paying fees for RK&A services, these RK&A service fees were significantly higher than they would have been had Defendants engaged in these processes.

98.     During the Class Period and because Defendants did not engage in any objectively reasonable and/or prudent efforts when paying fees for RK&A services to covered service providers, including but not limited to Transamerica, these RK&A service fees were significantly higher than they would have been had Defendants engaged in these efforts.

99.     Specifically, and for example, during the year 2018, the following graph and table illustrate that the Plan's RK&A fees were significantly higher as compared to other 401(k) and 403(b) plans of similar sizes with similar amounts of money under management during this same period of time.



**Comparative Plans' RK&A Fees Based on Publicly Available Information from Form 5500[1]**

| Plan | Participants | Assets | RK&A Price | RK&A Price /pp | Recordkeeper | Graph Color |
|---|---|---|---|---|---|---|
| Genesis Health System Retirement Savings Plan | 6,260 | $231,793,794 | $325,894 | $52 | Transamerica | Blue |
| St. Luke'S Health Network 403(B) Plan | 7,142 | $241,600,647 | $333,578 | $47 | Transamerica | Blue |
| Memorial Health System Defined Contribution Retirement Savings Plan | 7,318 | $221,242,194 | $385,754 | $53 | Transamerica | Blue |
| **Thedacare Retirement And 403(B) Savings Plan** | **7,847** | **$494,462,277** | **$815,863** | **$104** | **Transamerica** | **Red** |
| Waste Connections, Inc. 401k Profit Sharing Plan | 7,923 | $332,567,264 | $455,853 | $58 | Voya | White |
| Centerpoint Energy Savings Plan | 9,802 | $2,108,802,293 | $442,946 | $45 | Voya | White |
| Edward- Elmhurst Healthcare Retirement Savings Plan | 10,263 | $618,238,970 | $446,836 | $44 | Fidelity | White |
| Lancaster General Health Retirement Income 403(b) Account | 10,273 | $498,737,886 | $561,490 | $55 | Prudential | White |
| Flowers Foods, Inc. 401(k) Retirement Savings Plan | 10,789 | $607,338,501 | $683,296 | $49 | Great-West | White |
| Multicare Health System 403(B) Employee Savings Plan | 11,437 | $559,801,095 | $556,202 | $49 | Transamerica | Blue |

[1]Price calculations are based on 2018 Form 5500

100.    The underlying data and information reflected in the graph and table above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including the most recent Form 5500 filings and accompanying attachments by Defendants and the other entities and plans listed therein, some of whom are healthcare companies like Defendants who used the same recordkeeper, Transamerica.

101.    As the above graph and table illustrate, during the year 2018, a reasonable market rate RK&A fee would have been between approximately $44.00 and $58.00 per participant.

102.    As the above graph and table illustrate, during the year 2018, other plans of similar sizes with similar amounts of money under management as compared to the Plan paid recordkeepers an average of approximately $465,761, or approximately $50 per participant.

103.    As the above graph and table illustrate, during the year 2018, the Plan paid RK&A

fees to Transamerica totaling approximately $815,863, or approximately $104.00 per participant, more than double the amount that other plans of similar sizes with similar amounts of money under management paid to other recordkeepers, including but not limited to Defendants' same recordkeeper, Transamerica, during the year 2018.

104. During the year 2018, a prudent Plan Fiduciary would not have agreed to pay more than double what they could otherwise have paid for the same services from, in some instances and as identified in the graph and table above, the exact same covered service provider.

105. During the year 2018 and had Defendants been acting in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management as identified in the graph and table above – the Plan actually would have paid less than double in RK&A fees.

106. During the entirety of the Class Period, Defendants did not use its size to bargain or negotiate with covered service providers and recordkeepers, including but not limited to Transamerica, to defray or reduce administrative costs and RK&A fees to the Plan's Participants.

107. During the entirety of the Class Period and because Defendants did not use its size to bargain or negotiate with covered service providers and recordkeepers, including but not limited to Transamerica, to defray or reduce administrative costs and RK&A fees to the Plan's Participants, Defendants acted imprudently and unreasonable.

108. During the entirety of the Class Period and because Defendants did not use its size to bargain or negotiate with covered service providers and recordkeepers, including but not limited to Transamerica, to defray or reduce administrative costs and RK&A fees to the Plan's Participants, Defendants did not act in the best interests of the Plan's Participants.

109. From the years 2014 to 2018 during the Class Period and based upon the best

available truthful, accurate, and publicly available information, which was equally as available to Defendants during the Class Period, the Plan paid an average amount of at least approximately $713,928 per year in RK&A fees, which equated to an average of at least approximately $90.00 per participant per year, as identified in the following chart:

### Recordkeeping and Administration (RK&A) Fees

|  | 2014 | 2015 | 2016 | 2017 | 2018 | Average |
|---|---|---|---|---|---|---|
| Est. Conservative RK&A Fees | $559,516 | $612,171 | $713,720 | $868,372 | $815,863 | $713,928 |
| Participants | 7,574 | 8,966 | 7,657 | 7,811 | 7,847 | 7,971 |
| Est. Conservative RK&A Per Participant | $74 | $68 | $93 | $111 | $104 | $90 |

110. From the years 2014 to 2018 during the Class Period and based upon the best available truthful, accurate, and publicly available information, which was equally as available to Defendants during the Class Period, had Defendants been acting in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually would have paid significantly less than an average of approximately $713,928 per year in RK&A fees, which equated to an average of approximately $90 per participant per year.

111. From the years 2014 to 2018 during the Class Period and based upon the best available truthful, accurate, and publicly available information, which was equally as available to Defendants during the Class Period, had Defendants been acting in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually would have paid a reasonable market rate of approximately $400,000 per year in RK&A fees, which equates to approximately $50 per participant per year.

112. During the entirety of the Class Period, a prudent Plan Fiduciary would not agree to pay double what they could otherwise pay for the same services from, in some instances, the exact same covered service provider.

113. From the years 2014 to 2018 during the Class Period and based upon the best

available truthful, accurate, and publicly available information, which was equally as available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually additionally cost its Participants approximately $315,378 per year in RK&A fees, which equates to approximately $40 per participant per year.

114. From the years 2014 to 2018 during the Class Period and because Defendants did not act in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually cost its Participants a total minimum amount of approximately $1,474,348 in RK&A fees. This is based on the Plan actually costing its Participants approximately $294,870 per year in RK&A fees which equates to approximately $31.23 per participant per year.

115. During the entirety of the Class Period and based upon the best available truthful, accurate, and publicly available information, which was equally as available to Defendants during the Class Period, because Defendants did not act in the best interests of the Plan's Participants – and as compared to other plans of similar sizes with similar amounts of money under management – the Plan actually cost its Participants (when accounting for compounding percentages) a total, cumulative amount in excess of $2,106,524 in RK&A fees.

116. From 2014 through 2018, Defendants did not regularly and/or reasonably assess, in any way, the Plan's administrative costs and RK&A fees it paid to Transamerica.

117. From 2014 through 2018, Defendants did not engage in any regular and/or reasonable examination, comparison, or benchmarking of the Plan's administrative costs and RK&A fees it paid to Transamerica vis-à-vis the administrative costs and RK&A fees that other plans of similar sizes with similar amounts of money under management paid to their covered

service providers – who, in some instances, was Transamerica, the exact same provider as utilized by Defendants during the entirety of the Class Period.

118.    From 2014 through 2018, Defendants knew or had knowledge that it must engage in regular and/or reasonable examination, comparison, or benchmarking of the Plan's administrative costs and RK&A fees it paid to Transamerica, but Defendants simply failed to do so in any meaningful way whatsoever.

119.    From 2014 through 2018 and had Defendants engaged in any regular and/or reasonable examination, comparison, or benchmarking of the Plan's administrative costs and RK&A fees it paid to Transamerica, it would have realized and understood that the Plan was compensating Transamerica unreasonably and inappropriately for its size and scale, passing these unreasonable and excessive fee burdens to Plaintiff and the Plan Participants

120.    From 2014 through 2018 and by failing to recognize that the Plan and its participants were being charged much higher administrative costs and RK&A fees than they should have been and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

## STANDARD OF CARE FOR PRUDENT FIDUCIARIES SELECTING & MONITORING INVESTMENT OPTIONS

121.    There is a commonly accepted process to select and monitor investment options which is based on modern portfolio theory and the prudent investor standard. Under ERISA, Plan Fiduciaries are required to engage investment consultants or advisors to the extent that the Plan Fiduciaries do not have the investment expertise necessary to select and monitor investments under modern portfolio theory.

122.    That accepted process involves, among other things, evaluating the performance history, tenure, and stability of the current portfolio manager; the risk adjusted returns; and the

fees.

123. When an active investment option is chosen, one of the most critical aspects of the analysis is to choose a portfolio manager because it is the skill of the portfolio manager that differentially impacts the performance of the investment.

124. From the perspective of a Plan Participant, the other critical component of the analysis is the fees. However, the total expense ratio of an investment option is often comprised of multiple different types of fees, only one of which is specifically associated with the fee of the actual portfolio manager.

125. As a result, a Plan Fiduciary is required to understand the interrelationship between the pricing structure it has negotiated with the recordkeeper for RK&A services as well as the different fee components of the investment options selected to be made available to Plan Participants.

126. When a Plan Fiduciary can choose among different share classes (or other types of investment options, e.g., collective trusts) to receive the services of a specific portfolio manager, the Plan Fiduciary is required to understand all the fees related to the different share classes and choose the share class that is in the best interest of the Plan Participants. This is especially critical when the pricing structure provides compensation to the recordkeeper from revenue sharing paid by Plan Participants as part of the total expense ratio of the investment options selected by the Plan Fiduciaries.

127. If the RK&A pricing structure includes a revenue threshold, then a prudent Plan Fiduciary must choose the share class with the lowest net investment management fee. If the pricing structure does not include a revenue threshold, then a prudent Plan Fiduciary must ensure that the revenue sharing will not result in the payment of an unreasonable fee to the recordkeeper

for the RK&A services.

128.     A prudent Plan Fiduciary must ensure that the combination of the RK&A pricing structure and the selected share classes together provide the best outcome for Plan Participants.

129.     If a Plan Fiduciary chooses an active investment option when an alternative index option is available, the Plan Fiduciary must make a specific and informed finding that the probability that the active portfolio manager will outperform the index warrants the higher fees paid charged by the active portfolio manager and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants.

130.     If a Plan Fiduciary chooses an active investment option when an alternative index option is available, but the Plan Fiduciary does not make a specific and informed finding that the probability that the active portfolio manager will outperform the index (and as such warranting the higher fees paid charged by the active portfolio manager) and the risk/reward tradeoffs show that the potential of outperformance is in the best interest of Plan Participants, the Plan Fiduciary has acted unreasonably and/or imprudently.

131.     In February 2013, the Department of Labor issued guidance for the selection of target date funds in a publication titled, "Target Date Retirement Funds – Tips for ERISA Plan Fiduciaries."[3] Fiduciaries were given specific guidance to: (i) establish a process for comparing and selecting TDFs; (ii) establish a process for the periodic review of TDFs; (iii) understand the fund's investments – the allocation in different asset classes (stocks, bonds, cash), individual investments, and how these will change over time; (iv) inquire about whether a custom or non-proprietary target date fund would be a better fit for a plan; and (v) develop effective employee communications.

---

[3]      https://www.dol.gov/sites/dolgov/files/EBSA/about-ebsa/our-activities/resource-center/fact-sheets/target-date-retirement-funds.pdf

132.    The Department of Labor gave a very specific warning about the importance of keeping costs under control: "A difference of just one percentage point in fees (1.5% as compared with 0.5%) over 35 years dramatically affects overall returns. If a worker with a 401(k)-account balance of $25,000 averages a seven percent return, the worker will have $227,000 at retirement with the lower fee and $163,000 with the higher fee, assuming no further contributions."[4]

### THE PLAN PAID UNREASONABLY HIGH FEES FOR SHARE CLASSES

133.    Many mutual funds offer multiple classes of shares in a single mutual fund that are targeted at different investors. Generally, more expensive shares are targeted at small investors with less bargaining power, while lower cost shares are targeted at larger investors with greater assets. There is no material difference between share classes other than costs – the funds hold identical investments and have the same manager.

134.    Large defined contribution plans such as the Plan have sufficient assets to qualify for lower cost share classes. It is well known among institutional investors that mutual fund companies will waive investment minimums for a large plan.

135.    A prudent Plan Fiduciary uses a plan's asset size and negotiating power to invest in low cost share classes available in the market.

136.    A prudent Plan Fiduciary engages in an objectively reasonable search for and selection of the lowest-priced share classes available in the market.

137.    During the Class Period, Defendants knew or should have known that it must use its asset size and negotiating power to invest in low cost share classes available in the market.

---

[4]    U.S. Department of Labor, Employee Benefits Security Administration, A Look At 401(k) Plan Fees, at http://www.dol.gov/ebsa/publications/401k_employee.html

138. During the Class Period, Defendants knew or should have known that it must engage in an objectively reasonable search for and selection of the lowest-priced share classes available in the market.

139. During the Class Period, Defendants did not use its asset size and negotiating power to invest in low cost share classes available in the market.

140. During the Class Period, Defendants did not engage in an objectively reasonable search for and selection of the lowest-priced share classes available in the market.

141. The following charts identify Defendants' share class investments during the Class Period vis-à-vis more prudent, reasonable, and lower share class alternatives during this same time period:

| Defendants' Investment | | | | | Prudent Alternative Share Class | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Fee (%) | Ticker | Fund Name | Exp Ratio (%) | Revenue Sharing (%) | Net Investment Fee (%) | Defendants' Plan's Investment Excessive Fees (%) |
| ACAZX | Alger Capital Appreciation Fund Z | 0.87% | 0.10% | 0.77% | ACAAX | Alger Capital Appreciation A | 1.21% | 0.60% | 0.61% | 26% |
| AOTIX | AllianzGI Emerging Markets Opportunities Fund INSTL | 0.91% | 0.10% | 0.81% | AOTAX | AllianzGI Emerging Markets Opps A | 1.26% | 0.50% | 0.76% | 7% |
| BPRIX | BlackRock Inflation Protected Bond Fund Instl | 0.65% | 0.15% | 0.50% | BPRCX | BlackRock Inflation Protected Bond Inv C | 1.65% | 1.20% | 0.45% | 11% |
| GROYX | Pioneer Select Mid Cap Growth Fund Y | 0.79% | 0.35% | 0.44% | PGOFX | Pioneer Select Mid Cap Growth A | 1.03% | 0.60% | 0.43% | 2% |
| WACPX | Western Asset Core Plus Bond Fund | 0.45% | 0.10% | 0.35% | LWCPX | Western Asset Core Plus Bond C1 | 1.19% | 0.95% | 0.24% | 46% |
| PHYAX | Pimco High Yield Fund | 0.84% | 0.28% | 0.56% | PHDAX | PIMCO High Yield A | 0.94% | 0.45% | 0.49% | 14% |
| PTRAX | Pimco Total Return Fund | 0.96% | 0.28% | 0.68% | PTRRX | PIMCO Total Return R | 1.30% | 0.70% | 0.60% | 13% |
| RPFFX | Royce Premier Service Fund | 1.49% | 0.45% | 1.04% | RYPRX | Royce Premier Invmt | 1.17% | 0.15% | 1.02% | 2% |

142. The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to

Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's fee disclosures.

143.    Based upon data and information reflected in the charts above, the average excessive fee for Defendants not using a lower-priced, more efficient and/or prudent alternative share class during the Class Period was approximately 15%.

144.    During the Class Period and had Defendants used its asset size and negotiating power to invest in low cost share classes available in the market, the Plan would not have selected the funds in the "Defendants' Investment" columns of the charts above.

145.    During the Class Period and had Defendants used its asset size and negotiating power to invest in low cost share classes available in the market, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

146.    During the Class Period and had Defendants engaged in an objectively reasonable search for and selection of the lowest-priced share classes available in the market, the Plan would not have selected the funds in the "Defendants' Investment" columns of the charts above.

147.    During the Class Period and had Defendants engaged in an objectively reasonable search for and selection of the lowest-priced share classes available in the market, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

148.    During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, the Plan would not have selected the funds in the "Defendants' Investment" columns of the charts above.

149.    During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, the Plan would have selected the funds in the "Prudent Alternative Share Class" columns of the charts above.

150.     During the entirety of the Class Period, Defendants knew or should have known about the existence of cheaper or lower-cost share classes as identified in the "Prudent Alternative Share Class" columns of the charts above.

151.      During the entirety of the Class Period, Defendants knew or should have known to transfer the Plan funds into the cheaper or lower-cost share classes as identified in the "Prudent Alternative Share Class" columns of the charts above.

152.     A prudent fiduciary would not select high-cost share classes when lower-cost share classes are available for the same investment.

153.     During the entirety of the Class Period, Defendants selected higher-cost share classes when lower-cost share classes were available to the Plan for the same investment, to the substantial detriment of Plaintiff and the Plan's Participants.

154.     During the entirety of the Class Period and because Defendants selected higher-cost share classes when lower-cost share classes were available to the Plan for the same investment, the Plaintiff and the Plan Participants did not receive any additional services or benefits other than a higher cost for Plaintiff and the Plan Participants.

155.     As an example of Defendants' failure to engage in an objectively reasonable search for and selection of the lowest-priced share classes available in the market during the Class Period, consider the Alger Capital Appreciation Z (ACAZX) which was selected by the Plan Fiduciaries and made available to Plan Participants in the Plan during the entire Class Period. As of year-end 2018, Plan Participants had invested more than approximately $40,990,561 in this investment option. The portfolio manager of this investment option were Patricia Kelly and Ankur Crawford (Kelly & Crawford). Plan Participants can receive the identical investment management services of Kelly & Crawford through several different investment options (share classes) with different

fee structures. The fee structures for these varying Capital Appreciation investment options, all managed by Kelly & Crawford, are set forth in the chart below:

| Example of Different Share Class Fee Levels for Identical Investment Management Services | | | | |
|---|---|---|---|---|
| | Alger Capital Appreciation A | Alger Capital Appreciation C | Alger Capital Appreciation Z | Alger Capital Appreciation B |
| Share Class | A Class | C Class | Z Class | B Class |
| Investment Advisor | Alger | Alger | Alger | Alger |
| Investment Sub-Advisor | None | None | None | None |
| Portfolio Managers | Patrick Kelly Ankur Crawford | Patrick Kelly Ankur Crawford | Patrick Kelly Ankur Crawford | Patrick Kelly Ankur Crawford |
| Ticker | ACAAX | ALCCX | ACAZX | ACAPX |
| Investment Management Fee | 0.77% | 0.77% | 0.77% | 0.77% |
| Total Expense Ratio | 1.21% | 1.94% | 0.87% | 1.99% |
| Actual Revenue Sharing Credit Available | 0.60% | 1.25% | 0.00% | 1.00% |
| Net Investment Expense to Retirement Plans | 0.61% | 0.69% | 0.87% | 0.99% |

156. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period.

157. Plan Fiduciaries are required under ERISA to understand all the separate components of fees for different types of services charged to the plan and Plan Participants.

158. The second to last row of the chart above, "Actual Revenue Sharing Credit Available," is simply the mathematical difference between the total expense ratio and the investment management fee rate. Because each investment option negotiates its "revenue sharing" agreement separately with each recordkeeping platform, the revenue sharing rate could be different on different recordkeeping platforms and may also be larger or smaller than the amount indicated in the chart above. Revenue sharing rates are not always disclosed to Plan Participants on the Participant fee disclosure documents and, perhaps worse, are not even always disclosed on the 5500 forms filed by Plan Fiduciaries.

159. As illustrated in the chart above, the fee to receive the exact same investment

management skills of portfolio managers Kelly & Crawford are set forth in the "Investment Management Expense Fee" row and are low as 61 basis points. The actual option chosen by the Plan was 26 basis points more expensive (87 basis points).

160.    A Plan Fiduciary selecting any one of these investment options identified in the above chart will receive identical portfolio management services performed by the same portfolio manager with the only material difference being the amount of extra fees that are included in the Net Investment Expense to Retirement Plans" that will be paid by Plan Participants.

161.    As illustrated in the chart below, which is based on the $40,990,561 that the Plan invested in Alger Capital Appreciation Z (ACAZX) during the year 2018, because Defendants did not select cheaper, lower-cost, more prudent share classes available to the Plan and within which to invest the Plan's assets, Defendants caused substantial monetary damage and detriment to Plaintiff and the Plan's Participants.



- This chart is based on $40,990,561 that the Plan invested in Alger Capital Appreciation Z (ACAZX) during the year 2018

162. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period.

163. A prudent fiduciary conducting an impartial and objectively reasonable review of the Plan's investments during the Class Period would have conducted a review on at least a quarterly basis, would have identified cheaper, lower-cost, and/or more prudent share classes available, and would have transferred the Plan's investments into these cheaper, lower-cost, and/or institutional shares at the earliest opportunity.

164. During the entirety of the Class Period, Defendants: did not conduct an impartial and objectively reasonable review of the Plan's investments on at least a quarterly basis; did not identify cheaper, lower-cost, more prudent share classes available to the Plan; and did not transfer the Plan's investments into these cheaper, lower-cost, and/or institutional shares, all to the substantial detriment of Plaintiff and the Plan's Participants.

165. During the entirety of the Class Period and by failing to recognize that the Plan was invested in higher-cost share classes when lower-cost share classes were available to the Plan for the same investment and/or by failing to take effective remedial actions as described herein, Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

## **DEFENDANTS' INVESTMENTS IN THE PLAN**

166. A prudent fiduciary will consider all plan investments, including "suitable index mutual funds or market indexes (with such adjustments as may be appropriate)." Restatement (Third) of Trusts § 100 cmt. b(1).

167. While higher-cost mutual funds may outperform a less-expensive option over the short term, such as a passively managed index fund, they rarely do so over a longer term. See

Jonnelle Marte, Do Any Mutual Funds Ever Beat the Market? Hardly, The Washington Post, available at https://www.washingtonpost.com/news/get-there/wp/2015/03/17/do-any-mutualfunds-ever-beat-the-market-hardly/ (citing a study by S&P Dow Jones Indices that looked at 2,862 actively managed mutual funds, focused on the top quartile in performance and found most did not replicate performance from year to year); see also Index funds trounce actively managed funds: Study, available at http://www.cnbc.com/2015/06/26/index-funds-trounce-activelymanaged-funds-study.html ("long-term data suggests that actively managed funds "lagged their passive counterparts across nearly all asset classes, especially over the 10-year period from 2004 to 2014.")

168. Funds with high fees on average perform worse than less expensive funds, even on a pre-fee basis. Javier Gil-Bazo & Pablo Ruiz-Verdu, When Cheaper is Better: Fee Determination in the Market for Equity Mutual Funds, 67 J. Econ. Behav. & Org. 871, 873 (2009) (hereinafter "When Cheaper is Better"); *see also* Jill E. Fisch, Rethinking the Regulation of Securities Intermediaries, 158 U. Pa. L. Rev. 1961, 1967-75 (2010) (summarizing numerous studies showing that "the most consistent predictor of a fund's return to investors is the fund's expense ratio").

169. During the Class Period, Defendants selected and/or made available to the Plan's Participants more than 55 investment options.

170. Upon information and belief and during the Class Period, the more than 29 investment options that Defendants selected and/or made available to the Plan's Participants resulted in the Plan's Participants subsidizing the RK&A fees of other Participants.

171. During the Class Period, the chart below identifies several investment options that Defendants selected and/or made available to Plan Participants as compared to prudent alternative and less expensive options.

| Defendants' Investment | | | Prudent Alternative Investments | | | |
|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Ticker | Fund Name | Exp Ratio (%) | Defendants' Plan's Investment Excessive Fees (%) |
| ACAZX | Alger Capital Appreciation Fund Z | 0.87% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 2075% |
| AOTIX | AllianzGI Emerging Markets Opportunities Fund INSTL | 0.91% | FPADX | Fidelity® Emerging Markets Idx Instl Prm | 0.08% | 1038% |
| RLBEX | American Balanced Fund R4 | 0.61% | VBAIX | Vanguard Balanced Index I | 0.06% | 917% |
| REREX | American EuroPacific Growth Fund R4 | 0.84% | VIAAX | Vanguard Intl Div Apprec Idx Adm | 0.25% | 236% |
| BHYIX | BlackRock High Yield Bond Fund INSTL | 0.62% | VWEAX | Vanguard High-Yield Corporate Adm | 0.13% | 377% |
| BPRIX | BlackRock Inflation Protected Bond Fund Instl | 0.65% | VTSPX | Vanguard Shrt-Term Infl-Prot Sec Idx Ins | 0.04% | 1525% |
| MVCKX | MFS Mid Cap Value Fund R6 | 0.68% | VMVAX | Vanguard Mid-Cap Value Index Admiral | 0.07% | 871% |
| GROYX | Pioneer Select Mid Cap Growth Fund Y | 0.79% | VMGMX | Vanguard Mid-Cap Growth Index Admiral | 0.07% | 1029% |
| PURZX | Prudential Global Real Estate Fund Z | 0.92% | DFGEX | DFA Global Real Estate Securities Port | 0.24% | 283% |
| TASVX | Prudential QMA Small Cap Value Fund Z | 0.69% | VSIIX | Vanguard Small Cap Value Index I | 0.06% | 1050% |

| Defendants' Investment | | | Prudent Alternative Investments | | | Defendants' Plan's Investment Excessive Fees (%) |
|---|---|---|---|---|---|---|
| Ticker | Fund Name | Exp Ratio (%) | Ticker | Fund Name | Exp Ratio (%) | |
| VEXRX | Vanguard Explorer Fund | 0.34% | VSGIX | Vanguard Small Cap Growth Index I | 0.06% | 467% |
| WACPX | Western Asset Core Plus Bond Fund | 0.45% | ACOSX | AllianzGI Core Plus Bond Fund Class R6 | 0.25% | 80% |
| DFEMX | DFA Emerging Markets | 0.47% | FPADX | Fidelity® Emerging Markets Idx Instl Prm | 0.08% | 488% |
| PHYAX | Pimco High Yield Fund | 0.84% | VWEAX | Vanguard High-Yield Corporate Adm | 0.13% | 546% |
| PTRAX | Pimco Total Return Fund | 0.96% | ACOSX | AllianzGI Core Plus Bond Fund Class R6 | 0.25% | 284% |
| JMCVX | Perkins Mid Cap Value Fund | 0.84% | VMVAX | Vanguard Mid-Cap Value Index Admiral | 0.07% | 1100% |
| JSCVX | Perkins Small Cap Value Fund | 0.92% | VSIIX | Vanguard Small Cap Value Index I | 0.06% | 1433% |
| RPFFX | Royce Premier Service Fund | 1.49% | VSGIX | Vanguard Small Cap Growth Index I | 0.06% | 2383% |
| DFINX | Transamerica Partners Institutional Money Market Fund | 0.50% | VMRXX | Vanguard Prime Money Market Fund Admiral | 0.10% | 400% |
| SGRKX | Wells Fargo Adv Growth FD ADM | 0.96% | FSPGX | Fidelity® Large Cap Growth Idx Instl Prm | 0.04% | 2643% |

172.    The underlying data and information reflected in the charts above are truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's fee disclosures.

173.    In the charts above, the "expense ratio" refers to a percentage of the Plan's assets that were under management during the Class Period. For example, if a mutual fund share class deducts 1% of fund assets each year in fees, the fund's expense ratio would be 1%, or 100 basis points (or bps). (One basis point is equal to 1/100th of one percent (or 0.01%)). The fees deducted from a mutual fund's assets reduce the value of the shares owned by fund investors.

174.    A prudent fiduciary understands and knows that a fund's "expense ratio" is one of the most – if not the most – important considerations in the fund selection process.

175. During the Class Period, Defendants knew or should have known that a fund's "expense ratio" was one of the most – if not the most – important considerations in the fund selection process.

176. During the Class Period and based on the charts above, the average Plan expense ratio of the investments shown was 0.77%, or 77 basis points.

177. During the Class Period and based on the charts above, the average excessive fee percentage was 961%.

178. During the Class Period, Defendants did not engage in an objectively reasonable process when selecting funds for the Plan.

179. During the Class Period and because Defendants did not engage in an objectively reasonable process when selecting funds for the Plan, Defendants actually selected the funds identified in the "Defendants' Investment" column in the charts above.

180. During the Class Period and had Defendants engaged in an objectively reasonable process when selecting funds for the Plan, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

181. During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would not have selected the funds identified in the "Defendants' Investment" column in the charts above.

182. During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would have selected funds with lower "expense ratios" than those funds actually selected by Defendants as identified in the "Defendants' Investment" column in the charts above.

183. During the Class Period and had Defendants been acting in the best interests of the Plan's Participants, Defendants would have selected the funds identified in the "Prudent Alternative Investments" column in the charts above.

184. During the Class Period, Plaintiff had no knowledge of Defendants' process for selecting investments and regularly monitoring them to ensure they remained prudent.

185. During the Class Period, Plaintiff had no knowledge of how the fees charged to and paid by the Plan Participants compared to any other funds.

186. During the Class Period, Plaintiff did not know about the availability of lower-cost and better-performing (and other essentially identical) investment options that Defendants failed to reasonably offer because Defendants provided no comparative information to allow Plaintiff to evaluate and compare Defendants' investment options.

187. During the Class Period, Plaintiff did not individually select funds for her 403(b) Plan.

188. During the Class Period, Defendants failed to reasonably and properly evaluate the true cost of the services of each portfolio manager under the fee structure negotiated with Transamerica, thereby paying fees that were more than necessary to the detriment of Plaintiff and the Plan's Participants.

189. During the Class Period and had Defendants chosen investment options similar or identical to the funds identified in the "Prudent Alternative Investments" column in the charts above, the Plan's Participants would have been received the exact same portfolio management services but at a lower cost.

190. During the Class Period and because Defendants imprudently chose investment options that were not similar or identical to the funds identified in the "Prudent Alternative

Investments" column in the charts above, Defendants' caused unreasonable and unnecessary losses to Plaintiff and the Plan's Participants.

191. During the Class Period, Defendants failed to consider materially similar but cheaper alternatives to the Plan's investment options. The chart above demonstrates that the expense ratios of the Plan's investment options between the years 2014 to 2020 were more expensive by significant multiples of comparable passively managed and actively managed alternative funds in the same investment style. A reasonable investigation would have revealed the existence of these lower-cost alternatives.

192. During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, resulting in the selection of funds identified in the "Defendants' Investment" column in the charts above, Plaintiff and the Plan's Participants incurred actual expenses and costs as identified in the "Actual Investment Lineup" portion of the chart below.

193. During the Class Period and had Defendants acted in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants would have prudently chosen lower-cost investment alternatives as identified in the "Alternative Investment Lineup" portion of the chart below.

194. During the Class Period and because Defendants failed to act in the best interests of the Plan's Participants by engaging in an objectively reasonable investigation process when selecting its investments, Defendants caused unreasonable and unnecessary losses to Plaintiff and the Plan's Participants in the amount of approximately $13,194,513 and as detailed in the following chart:

### Investment Fee Details

| | 2014 | 2015 | 2016 | 2017 | 2018 | 2019 |
|---|---|---|---|---|---|---|
| **Actual Investment Lineup** | | | | | | |
| **Total Expense Ratio** | $1,869,256 | $1,930,748 | $2,273,252 | $2,737,809 | $2,587,277 | $2,639,435 |
| | | | | | | |
| **Prudent Alternative Investments** | | | | | | |
| **Total Expense Ratio** | $448,075 | $658,928 | $823,327 | $899,649 | $868,690 | $884,374 |
| | | | | | | |
| **Est. Investment Damages** | $1,421,182 | $1,271,820 | $1,449,924 | $1,838,161 | $1,718,588 | $1,755,061 |
| **Compounding Percentage (VIIIX)** | | 1.39% | 11.95% | 21.82% | -4.41% | 31.48% |
| **Est. Cumulative Investment Damages** | $1,421,182 | $2,712,756 | $4,486,855 | $7,304,047 | $8,700,526 | $13,194,513 |

195. The underlying data and information reflected in the chart above is truthful, accurate, and derived from publicly available information, which was equally as available to Defendants during the Class Period, including but not limited to Plaintiff's Plan quarterly statements, the Plan's Summary Description, and the Plan's fee disclosures.

196. During the entirety of the Class Period and by failing to engage in an objectively reasonable investigation process when selecting its investments as described herein, Defendants breached their fiduciary duties to Plaintiff and the Plan Participants.

### EXCESSIVE FEES ASSOCIATED WITH THE PLAN'S STABLE VALUE FUNDS

197. Stable value funds are fairly common in 403(b) plans. Generally, stable value products make use of special guaranteed investment contracts known as "GIC," or "wraps," that have their own risk and return characteristics.

198. Stable value funds are not offered as mutual funds and typically are structured as: (i) an insurance company general account; (ii) an insurance company separate account; or (iii) a synthetic GIC-based fund, typically in a Collective Investment Trust ("CIT"). The differences between the different types of funds are critical from a fiduciary standpoint.

199. A stable value account in a direct contribution retirement plan is similar to a money market fund in that it provides liquidity and principal protection, and similar to a bond fund in that

it provides consistent returns over time. It differs from both in that it seeks to generate returns greater than a money market and equivalent to a short – intermediate – term bond fund. Stable value funds are able to do this because Participant behavior is such that the amount of money invested in the account is relatively stable over time. This enables fund providers to offer better crediting rates (the rate of return) and to guarantee Participants will not lose money by guaranteeing the fund transacts at book value. Stable value accounts also "stabilize" the returns through the use of an imbedded formula which is part of the contract with the plan that smooths out the volatility of the fund resulting from fluctuations in interest rates associated with funds.

200. There are several different types of stable value accounts in the 403(b) marketplace. Large plans overwhelmingly offer "synthetic" stable value funds, which are the least risky, because principal is guaranteed by multiple "wrap providers" and the fund owns the assets of the underlying funds. The 403(b) market has been slower to accept synthetic-based stable value funds due to some regulatory interpretations, but one major provider has this option for 403(b) plans like ThedaCare's. Separate account products, where the assets of the underlying funds are held in the separate account of an insurance carrier, are riskier because there is only one "wrap" provider. As a result, they offer higher crediting rates. General account products, where the funds are held unrestricted in the general account of the insurance carrier, are the riskiest type of stable value funds and consequently should offer the highest rates.

201. During the Class Period, Defendants entered into two insurance contracts with Transamerica Life Insurance Company ("TLIC") and one with the Prudential Retirement Insurance and Annuity Company ("Prudential").

202. As of the end of 2018, the TLIC general account Guaranteed Investment Contract (GIC) held approximately $479,132, while a TLIC separate account held $135,402. The Prudential GIC held $50,787,423.

203. During the Class Period, investment funds were deposited by the insurance companies in these general and separate accounts, which enabled the insurance companies to earn a "spread" equal to the difference between the crediting rate and the returns earned by the insurance companies from general account funds.

204. The insurance companies' GIC is subject to the single entity credit risk of the insurance companies, the issuer of the contract. The crediting rate, set in advance by the insurance companies and reset from time to time in the insurance companies' sole discretion, is not tied to the performance of a diversified pool of assets in which the investors in the fund have an interest. There is also substantial liquidity risk since there is no outside market in these contracts.

205. A prudent Plan Fiduciary has an obligation to monitor the fees and performance of the insurance companies' GIC and to remove or replace it where a substantially identical investment option could be obtained from the same provider at a lower cost.

206. During the Class Period, Defendants had an obligation to monitor the fees and performance of the insurance companies' GIC and to remove or replace it where a substantially identical investment option could be obtained from the same provider at a lower cost.

207. During the Class Period, Defendants had a continuing duty to regularly monitor both the performance and fees of the Transamerica and Prudential GICs.

208. During the Class Period, Defendants knew or should have known that they had a continuing duty to regularly monitor both the performance and fees of the Transamerica and Prudential GICs.

209.    During the Class Period, Defendants did not regularly monitor either the performance or fees of the Transamerica and Prudential GICs.

210.    During the Class Period, Defendants had a continuing duty to regularly remove high fee and/or underperforming stable value fund investment options from the Plan.

211.    During the Class Period, Defendants knew or should have known that they had a continuing duty to regularly remove high fee and/or underperforming stable value fund investment options from the Plan.

212.    During the Class Period, Defendants unreasonably failed to remove high fee and/or underperforming stable value fund investment options from the Plan, which resulted in the Plan suffering investment losses.

213.    During the Class Period and had Defendants regularly monitored the fees and performance of the insurance companies' GIC and the stable value fund investment options in the Plan, Defendants would have realized there were other, lower-cost, better performing insurance companies' GIC and stable value fund investment options than those contained within the Plan, including but not limited to the Transamerica and Prudential GICs.

214.    During the Class Period and because Defendants did not regularly monitor the fees and performance of the insurance companies' GIC and the stable value fund investment options in the Plan, the Plan's Participants suffered performance losses in the amount of the difference between the actual performance of the Transamerica and Prudential GICs and the performance of a lower-cost, better performing and prudent alternative.

# CLASS ACTION ALLEGATIONS

215.    29 U.S.C. § 1132(a)(2) authorizes any participant or beneficiary of the Plan to bring an action on behalf of the Plan to enforce a breaching fiduciary's liability to the Plan under 29 U.S.C. § 1109(a).

216.    In acting in this representative capacity, Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as representatives of, the following Class:

> All participants and beneficiaries of the ThedaCare Retirement and 403(b) Savings Plan beginning six (6) years before the commencement of this action and running through the date of judgment, excluding the Defendants or any participant/beneficiary who is a fiduciary to the Plan.

217.    The members of the proposed Class are readily ascertainable. The number and identity of the members of the proposed Class are determinable from the records of Defendants. For purposes of notice and other purposes related to this action, putative Class members' names and addresses are readily available from Defendants such that notice can be provided by permissible means under Fed. R. Civ. P. 23.

218.    Although the precise number of putative Class members is unknown, upon information and belief, the proposed Class includes more than 8,000 members and is so numerous that joinder of all of its members is impracticable, pursuant to Federal Rule of Civil Procedure 23(a)(1), and more importantly the disposition of their claims as a class will benefit the parties and the Court.

219.    Plaintiff's claims are common to those claims which could be alleged by any member of the proposed Class, and the relief sought is typical of the relief which would be sought

by each member of the proposed Class in separate actions. Common questions of law and fact which predominate this action include, but are not limited to, all of the following:

- Whether Defendants are fiduciaries liable for the remedies provided by 29 U.S.C. § 1109(a);

- Whether Defendants breached their fiduciary duties to the Plan;

- The amount of actual monetary losses suffered by the Plan resulting from each breach of fiduciary duty; and

- What Plan-wide equitable and other relief the Court should impose in light of Defendants' breach of duty.

220. Plaintiff's claims are typical of the claims of the Class pursuant to Federal Rule of Civil Procedure 23(a)(3), because Plaintiff was a Plan Participant during the Class Period and all putative Class members, as Plan Participants, were harmed by Defendants' misconduct.

221. Plaintiff is able to fairly and adequately protect the interests of the proposed Class, pursuant to Federal Rule of Civil Procedure 23(a)(4), because Plaintiff has no interests antagonistic to, or that otherwise conflicts with, the interests of the proposed Class, and she is committed to the vigorous representation of the Class. Plaintiff has engaged and is represented by experienced and competent lawyers who are experienced in both class action litigation and complex ERISA claims like those set forth herein.

222. A class action is superior to other available methods for the fair and efficient adjudication of the controversy – particularly in the context of wage and hour litigation where individual class members lack the financial resources to vigorously prosecute a lawsuit against corporate defendants. Class action treatment will permit a number of similarly-situated persons to prosecute common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of efforts and expense that numerous individual actions engender.

223.     Certification is further appropriate under Federal Rule of Civil Procedure 23(b)(1), because prosecution of separate actions for these breaches of fiduciary duties by individual participants and beneficiaries would create the risk of: (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendant concerning its discharge of fiduciary duties to the Plan and personal liability to the Plan under 29 U.S.C. § 1109(a); and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

224.     Certification is also appropriate under Federal Rule of Civil Procedure 23(b)(2) because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the class as a whole.

225.     The claims brought by the Plaintiff arise from fiduciary breaches as to the Plan in its entirety and do not involve mismanagement of individual accounts. The claims asserted on behalf of the Plan fall outside the scope of any exhaustion language in individual participants' plans. Exhaustion is intended to serve as an administrative procedure for participants and beneficiaries whose claims have been denied and not where a participant or beneficiary brings suit on behalf of a plan for breaches of fiduciary duty.

226.     Under ERISA, an individual "participant" or "beneficiary" are distinct from an ERISA plan. A participant's obligation – such as a requirement to exhaust administrative remedies – does not, by itself, bind the plan.

227. Moreover, any administrative appeal would be futile because the entity hearing the appeal (the Plan Administrator) is the same Plan Administrator that made the decisions that are at issue in this lawsuit. Policy supporting exhaustion of administrative remedies in certain circumstances – that the Court should review and where appropriate defer to a plan administrator's decision – doesn't exist here because courts will not defer to a plan administrator's legal analysis and interpretation.

**FIRST CLAIM FOR RELIEF**
**Breaches of Duties of Loyalty and Prudence of ERISA, as Amended**
**(Plaintiff, on behalf of himself and Class – RK&A Fees)**

204. Plaintiff restates the above allegations as if fully set forth herein.

205. Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

206. 29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in their administration of the Plan.

207. Defendants, as fiduciaries of the Plan, are responsible for selecting a recordkeeper that charges reasonable RK&A fees.

208. During the Class Period, Defendants had a fiduciary duty to do all of the following: ensure that the Plan's RK&A fees were reasonable; manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

209. During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to ensure that the Plan's RK&A fees were reasonable, manage the assets of the Plan for the sole and exclusive benefit of Plan

Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

210.     During the Class Period, Defendants further had a continuing duty to regularly monitor and evaluate the Plan's recordkeeper to make sure it was providing the contracted services at reasonable costs, given the highly competitive market surrounding recordkeeping services and the significant bargaining power the Plan had to negotiate the best fees.

211.     During the Class Period, Defendants breached their duty to Plan Participants, including Plaintiff, by failing to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's recordkeeper in comparison to other recordkeeping options.

212.     Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A).

213.     Defendants' failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

214.     As a result of Defendants' breach of fiduciary duty of prudence and loyalty with respect to the Plan, as aforesaid, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

215.     Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of

fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

## SECOND CLAIM FOR RELIEF
### Breaches of Duties of Loyalty and Prudence of ERISA, as Amended
### (Plaintiff, on behalf of himself and Class – Investment Management Fees)

216.    Plaintiff restates the above allegations as if fully set forth herein.

217.    Defendants are fiduciaries of the Plan under 29 U.S.C. §§ 1002(21) and/or 1102(a)(1).

218.    29 U.S.C. § 1104 imposes fiduciary duties of prudence and loyalty upon Defendants in managing the investments of the Plan.

219.    Defendants, as fiduciaries of the Plan, are responsible for selecting prudent investment options, ensuring that those options charge only reasonable fees, and taking any other necessary steps to ensure that the Plan's assets are invested prudently.

220.    During the Class Period, Defendants had a fiduciary duty to do all of the following: manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries; defray reasonable expenses of administering the Plan; and act with the care, skill, diligence, and prudence required by ERISA.

221.    During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to manage the assets of the Plan for the sole and exclusive benefit of Plan Participants and beneficiaries, defray reasonable expenses of administering the Plan, act with the care, skill, diligence, and prudence required by ERISA.

222.    Defendants, as fiduciaries of the Plan, had a continuing duty to regularly monitor and independently assess whether the Plan's investments were prudent choices for the Plan and to

remove imprudent investment options regardless of how long said investments had been in the Plan.

223. During the Class Period, Defendants breached their fiduciary duties of prudence and loyalty to Plan Participants, including Plaintiff, by failing to engage in a prudent process for monitoring the Plan's investments and removing imprudent ones within a reasonable period.

224. Defendants were directly responsible for ensuring that the Plan's investment management fees were reasonable, selecting investment options in a prudent fashion in the best interest of Plan Participants, prudently evaluating and monitoring the Plan's investments on an ongoing basis and eliminating funds or share classes that did not serve the best interest of Plan Participants, and taking all necessary steps to ensure that the Plan's assets were invested prudently and appropriately.

225. Defendants failed to employ a prudent and loyal process by failing to critically or objectively evaluate the cost and performance of the Plan's investments and fees in comparison to other investment options. Defendants selected and retained for years as Plan investment options mutual funds with high expenses relative to other investment options that were readily available to the Plan at all relevant times.

226. Through these actions and omissions, Defendants breached their fiduciary duties of prudence and loyalty with respect to the Plan in violation 29 U.S.C. § 1104(a)(1)(A).

227. Defendants failure to discharge their duties with respect to the Plan with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent person acting in a like capacity and familiar with such matters would have used in the conduct of an enterprise of like character and with like aims, breaching its duties under 29 U.S.C. § 1104(a)(1)(B).

228. As a result of Defendants' breach of their fiduciary duties of prudence and loyalty with respect to the Plan, as aforesaid, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

229. Defendants are liable under 29 U.S.C. §§ 1109(a) and 1132(a)(2) to make good to the Plan the losses resulting from the breaches, to restore to the Plan any profits defendants made through the use of Plan assets, and to restore to the Plan any profits resulting from the breaches of fiduciary duties alleged in this Count. In addition, Defendants are subject to other equitable relief pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2).

### THIRD CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
### (Plaintiff, on behalf of himself and Class – RK&A Fees)

204. Plaintiff restates the above allegations as if fully set forth herein.

205. Defendants had the authority to appoint and remove members or individuals responsible for Plan RK&A fees and knew or should have known that these fiduciaries had critical responsibilities for the Plan.

206. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan RK&A fees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

207. Defendants had a duty to ensure that the individuals responsible for Plan administration possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

208.     Defendants  breached their fiduciary duties by, among other things:

a.       Failing to monitor and evaluate the performance of individuals responsible for Plan RK&A fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high RK&A expenses;

b.       Failing to monitor the process by which Plan recordkeepers were evaluated and failing to investigate the availability of lower-cost recordkeepers; and

c.       Failing to remove individuals responsible for Plan RK&A fees whose performance was inadequate in that these individuals continued to pay the same RK&A costs even though benchmarking and using other similar comparators would have showed that maintaining Transamerica as record keeper was imprudent, excessively costly, all to the detriment of the Plan and Plan Participants' retirement savings.

209.     As the consequences of the foregoing breaches of the duty to monitor for RK&A fees the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

210.     Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan  all loses caused by their failure to adequately monitor individuals responsible for Plan RK&A fees. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## FOURTH CLAIM FOR RELIEF
### Failure to Adequately Monitor Other Fiduciaries under ERISA, as Amended
### (Plaintiff, on behalf of himself and Class – Investment Management Fees)

211.     Plaintiff restates the above allegations as if fully set forth herein.

212. Defendants had the authority to appoint and remove members or individuals responsible for Plan investment management and were aware that these fiduciaries had critical responsibilities for the Plan.

213. In light of this authority, Defendants had a duty to monitor those individuals responsible for Plan investment management to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

214. Defendants had a duty to ensure that the individuals responsible for Plan investment management possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties); had adequate financial resources and information; maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan's investments; and reported regularly to Defendants.

215. Defendants breached their fiduciary duties by, among other things:

  a.   Failing to monitor and evaluate the performance of individuals responsible for Plan investment management or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of unreasonably high expenses, choices of fund's class of shares, and inefficient fund management styles that adversely affected the investment performance of the funds' and their Participants' assets as a result of these individuals responsible for Plan imprudent actions and omissions;

  b.   Failing to monitor the process by which Plan investments were evaluated, failing to investigate the availability of lower-cost share classes, and failing to investigate the availability of lower-cost collective trust vehicles; and

c.　Failing to remove individuals responsible for Plan administration whose performance was inadequate in that they continued to maintain imprudent, excessively costly, and poorly performing investments within the Plan, all to the detriment of the Plan and Plan Participants' retirement savings.

216.　As a result of Defendants' foregoing breaches of the duty to monitor, the Plaintiff and Plan Participants suffered unreasonable and unnecessary monetary losses.

217.　Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), ThedaCare is liable to restore to the Plan all loses caused by their failure to adequately monitor individuals responsible for Plan administration. In addition, Plaintiffs are entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

**WHEREFORE**, Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

A.　A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2), of the Federal Rules of Civil Procedure;

B.　Designation of Plaintiff as Class Representative and designation of Plaintiff's counsel as Class Counsel;

C.　A Declaration the Defendants have breached their fiduciary duties under ERISA;

D.　An Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including restoring to the Plan all losses resulting from imprudent investment of the Plan's assets, restoring to the Plan all profits the Defendants made through use of the Plan's assets, and restoring to the Plan all profits which the Participants would have made if the Defendants had fulfilled their fiduciary obligation;

E.　An Order requiring the Defendant ThedaCare to disgorge all profits received from, or in respect of, the Plan, and/or equitable relief pursuant to 29 U.S.C. § 1132(a)(3) in the form of an accounting for profits, imposition of a constructive trust, or a surcharge against ThedaCare as necessary to effectuate said relief, and to prevent ThedaCare's unjust enrichment;

F.     An Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties;

G.     Other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan Fiduciaries deemed to have breached their fiduciary duties;

H.     An award of pre-judgment interest;

I.     An award of attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

J.     Such other and further relief as the Court deems equitable and just.

Dated this 12th day of August, 2020

WALCHESKE & LUZI, LLC
Counsel for Plaintiff

s/ *Paul M. Secunda*
James A. Walcheske, WI State Bar No. 1065635
Scott S. Luzi, WI State Bar No. 1067405
Paul M. Secunda, WI State Bar No. 1074127

WALCHESKE & LUZI, LLC
15850 W. Bluemound Rd., Suite 304
Brookfield, Wisconsin 53005
Telephone: (262) 780-1953
Fax: (262) 565-6469
E-Mail: jwalcheske@walcheskeluzi.com
E-Mail: sluzi@walcheskeluzi.com
E-Mail: psecunda@walcheskeluzi.com